SAME CASE—ON AN APPLICATION FOR A RE-HEARING.

*Micou*, for a re-hearing. The parties reside in Boston. The plaintiffs, on the 9th February, 1842, attached the rights of the defendant for debt, in the hands of certain garnishees residing in New Orleans. On the 14th February, in Boston, the defendant filed his petition, under the bankrupt law of the United States, praying to be declared a bankrupt. The attorney appointed by the court from which this appeal is taken, to represent the absent defendant, pleaded "the surrender of the bankrupt's property and his act of bankruptcy, as conclusive of all suits, whether by attachment, or otherwise." The fact of the filing of the petition, to be declared a bankrupt, was admitted; but the exception was overruled, and judgment rendered for the plaintiffs. The defendant, by his counsel appointed, &c., has appealed. On the 17th May, after the appeal had been filed in this court, upon the suggestion of the counsel for the defendant that a decree of bankruptcy had intervened, "it was ordered that George F. Kuhn, assignee, be made a party to the suit, in lieu of the defendant." The record does not show that there was any appearance on the part of the assignee, nor that any steps were taken to make him a party to the proceedings. The counsel of the defendant has contended, that the filing of the petition to be declared a bankrupt, operates as a supersedeas or stay of proceedings in the State

court; and that the court below could proceed no further in the case, until the appearance of the assignee. The opinion pronounced by this court recognizes the position, and, accordingly, remands the case, and orders the court below to allow a reasonable time for the appearance of the assignee, and then to proceed in accordance with the views expressed in the opinion.

It was not until this opinion had been pronounced, that the counsel, now appearing, became interested in the case, and prayed for time to present a petition for a re-hearing. The court, willing to hear and examine all that could be urged against its opinion, and no doubt desirous that its decision on a point of such delicacy and importance, should not, when final, incur the imputation of having been pronounced without proper deliberation, granted time. Under the circumstances of the case now presented, it devolves upon the court to determine what effect is produced upon judicial proceedings, both as to the property and person of a bankrupt, by proceedings in bankruptcy under the late law of Congress.

The 3d section of that act declares, that all the property, &c. of every bankrupt, " who shall, by a decree of the proper court, be declared to be a bankrupt within this act, shall, by mere operation of law, *ipso facto, from the time of such decree*, be deemed to be divested out of such bankrupt," &c. ; " that the same shall be vested, by force of such decree, in such assignee," &c. ; and that " the assignee shall be vested with all the rights, titles, powers and authorities, to sell, manage and dispose of the same, *and to sue for and defend the same*, as fully to all intents and purposes, as if the same were vested in or might be exercised *by such bankrupt*, before or at the time of his *bankruptcy declared* as aforesaid."

The words used are plain, concise and exclusive. It would seem, that if the estate is divested *from the time* of the decree, it is not divested before the decree ; and, consistent with itself, the law, recognizing the bankrupt to be the owner until the decree, leaves to him the prosecution and defence of all suits involving the rights of the property, until an assignee be appointed and authorized to succeed him. The same section provides, that "all suits in law and equity, *then pending*, in which such bankrupt is a party, may be prosecuted and defended by such assignee," &c.

If the question is to be decided under these provisions of the

law, it is easily put at rest. The language is plain beyond the necessity of interpretation. The bankrupt remains the owner and represents the property in court, as well as out of court, until the decree; then his place is filled, *quoad the property*, by the assignee. In regard to his personal rights and his future property, the bankrupt himself remains their guardian. To make the application to the case before the court, we would say that the exception filed should not have been regarded, and that the court should have proceeded, as it did, to give judgment against the bankrupt, who was the only defendant in the cause. The rights of the assignee, if one were appointed, would not be precluded by the judgment.

The only expression in the law itself relied on to control the provisions of the third section, is that contained in the first section. It declares that any debtor whose debts, are of a certain character, filing his petition in the form prescribed, " shall be deemed a bankrupt within the purview of the act, and may be so declared," &c. The argument, then, assumes, that the debtor, being deemed a bankrupt from the date of the petition, the decree, when pronounced, necessarily reverts to the date of the petition, and that the property is therefore divested *from that date;* in other words, that the consequence of being *deemed* a bankrupt, is the divesting of the property and judicial rights. But we must not forget that this is the sole act of the United States upon the subject of bankruptcy; that there is no law, either common or statute, of the United States, which says that a bankrupt shall have no rights of property; and, that our ideas of the effect of bankruptcy, are derived principally from the English law. There is nothing in the meaning of the word bankrupt, any more than in the word insolvent, that necessarily implies a divesting of property. If the law fixed no time, *from which* the decree, when pronounced, should operate, the courts would hardly be justified, under this expression, in giving it a retroactive effect. Still less can so remote an inference control the positive provisions of the law.

The counsel argues, that the supposed stay of proceedings from the filing of the petition, and the relation back to that date of the powers of the assignee, result—

*First.* From the object and intent of the law itself.

*Second.* From the established principles and cases under bankrupt laws in general.

*Third.* From the spirit and policy of the bankrupt laws of Louisiana.

Before considering any of these arguments, we must advert to the first principles or rules of interpretation. The object of construction is to ascertain the will of the legislator. If the words of the law are plain—if one part of the law does not contradict another, nothing remains for interpretation. The will of the lawgiver being understood, courts have only to carry it into effect. "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing the spirit." Civil Code, art. 13.

So Blackstone, vol. 1, p. 59, says, the *words* of the law in their ordinary meaning, are *first* to determine the will of the legislature. It is only when the language of the law is ambiguous or obscure, that judges are permitted to resort to the *context,* the *subject matter,* the *effect* and *consequences,* or *the reason and spirit of the law.*

There being nothing ambiguous in the language of the third section—there being nothing in the law itself contradicting its expressions, it might well be assumed that the words of that section put an end to the argument. But a proper deference for the authorities cited, and for the court itself, which has pronounced an opinion adverse to these views, admonish me that it may be unsafe to rest upon even these indisputable principles.

In examining the positions taken by the opposite counsel, I will reverse the order adopted by him, and first consider the enactments of other systems of bankruptcy, because, by comparing them with our own when analogous, and by contrasting them when different, we shall be better prepared to form a correct opinion of what was the true intention of Congress upon this important point. The statute of 13th Elizabeth, c. 7, gave to the commissioners in bankruptcy " full power to dispose of all the lands and tenements of the bankrupt, which he had in his own right, *when he became a bankrupt,* or which shall descend to him," &c. 2 Blackstone, 285.

" By virtue of the statutes of 1 Jac. I, chap. 15, and 21 Jac. I, c. 19, all the personal estate and effects of the bankrupt, are con-

sidered as vested, by the act of bankruptcy, in the future assignees of his commissioners." 2 Ib. 485.

" The property vested in the assignees, is the whole that the bankrupt had in himself, *at the time he committed* the first act of bankruptcy," &c. 2 Ib. 485. For the words of the statutes, see Bacon's Abridgment, *verbo* Bankrupt. As the act of bankruptcy might have long preceded the suing out of the commission, the dealings of the bankrupt with others, even without notice, were liable to be set aside, and great injury and injustice frequently re-sulted. Hence the necessity of modifying the doctrine of relation was soon felt, and various exceptions were made, from time to time, by the laws. These exceptions are stated in their order, in Eden on Bankruptcy, (258–9, London edition,) and, with every other portion of the bankrupt code of Great Britain, were digested in the consolidating act of 6 Geo. 4, c. 16. By the statute of 2 & 3 Vict. c. 29, " all dealings and transactions with any bankrupt, *bona fide* made and entered into before *the date and issuing of the fiat* against him, and all *attachments and executions* against the lands and tenements or goods and chattels of the bankrupt, *bona fide* executed or levied before the date and issuing of the fiat, shall be deemed to be valid, notwithstanding any prior act of bankruptcy ;" provided the person so dealing with the bankrupt, or at whose suit such execution or attachment shall have issued, had no notice of the prior act of bankruptcy. See statute quoted in note, 38 Eng. Com. Law, Rep. 134.

The Code de Commerce of France enacts, art. 441. " *L'ouver-ture de la faillite est declarée par le tribunal de commerce, son époque est fixée, soit par la retraite du débiteur, &c.*

Art. 442. " *Le failli, à compter du jour de la faillite, est des-saisi de plein droit, de l'administration de tous ses biens.*"

Art. 443. " *Nul ne peut acquérir privilège ni hypothèques, sur les biens du failli, dans les dix jours qui précèdent l'ouverture de la faillite.*"

Under the first bankrupt law of the United States, the provisions of the English law were adopted. The assignment made by the commissioners to the assignee of the bankrupt's estate, " shall be good at law and in equity, against the bankrupt and all persons claiming under him *by any act done at the time, or after he `shall*

*have committed the act of bankruptcy ;*" provided, that *bona fide* purchases by persons having no notice of the commission of the act, shall not be invalidated. Acts of 1800, ch. 19, sect. 10.

The provisions of the law of Louisiana are too familiar to justify their being quoted at length. Suffice it to say, that a judicial stay of proceedings was granted by the judge, as the first step in the *cessio bonorum,* under the Spanish jurisprudence, whence our own is derived. *Elmes v. Estevan,* 1 Mart. 193. That the same formality was directed to be observed by the Code of 1808, p. 294, art. 172 ; by the act of 1817 ; and by the Civil Code of 1825, art. 2172. The petition of the debtor imports a surrender of property, which the act of 1826 directs the judge to accept for the benefit of the creditors, and all subsequent attachments, seizures and levies are expressly forbidden. The date of the cession, when the surrender is voluntary, and of the petition of the creditors, in the few cases of involuntary bankruptcy, is definitely fixed as the period when the power of the debtor over his estate ceases, and that of the creditors begins.

The first and most striking suggestion, presented by the quotations which we have made from these laws, is that in no one of them is the point of time, at which the debtor ceases and the assignee begins to be the owner of the property of the bankrupt, left to inference or argument. In all of these systems, that date has been fixed by positive and express enactment. Indeed, there is no single feature of the bankrupt law of greater importance ; none so apt, if left uncertain, to give rise to litigation, and to unsettle the titles to property and estates.

Now in the construction of a law, other laws in *pari materia* are properly consulted. " What is clear in one statute, may be called in aid to explain what is doubtful in another." Civ. Code, art. 17. This rule must generally refer to acts of the same legislature, for the will of one legislature may be better inferred from its own acts, than from the acts of other legislatures. Yet if the laws of two countries, on the same subject, appear, from their points of resemblance, to have had a common origin—to have been founded on institutions, habits and wants of a similar character, each code forms for the other, a valuable and legitimate source of argument and authority. But in their comparison, we must take care not to confound them, or to adopt for one country the will of the legislature

of another country.   If particular provisions of the two laws coin-
cide, the clear expressions of the one code, may be cited to illus-
trate the *doubtful* terms of the other.   But if, from the comparison,
a contrast results, instead of a resemblance—if the language of our
law be clear, but in direct opposition to the corresponding provi-
sion of the statute cited for illustration, what are we to conclude,
save that the foreign system has been examined and rejected, and
that our legislature has willed that the law shall be different from
it elsewhere ?   A reference to foreign statutes, with any other
view, is inadmissible.   To argue that a positive provision of our
law can be controlled, by showing that it differs from other laws,
is to maintain that the will of a foreign legislature is superior to
the power of our own.   The argument degenerates into paradox,
and assumes that the law is different from what the legislature that
made it, intended it should be.   Yet the counsel contends, that
the policy and language of the law of England and of the law of
Louisiana support his doctrine, and, therefore, that the law of Con-
gress upon the same subject, must necessarily be the same.   If
the argument be not striking from its force, it is certainly remark-
able for its novelty.

The counsel quoted at large the provisions of the third section,
yet he did not favor us with any comment upon the expressions
used "*from the time of the decree,*" &c.   He treats the question
at issue, as one depending solely upon deductions from the spirit
and intent of the law, and of other laws ; and in his eagerness
thus to infer a rule, he has overlooked the rule expressly prescrib-
ed by the law itself.

The omission of Congress to fix a date at which the bankrupt
law should affect the property of the bankrupt, would have evinced
the most culpable disregard of the public welfare, which it is
supposed to be the object of all laws to promote.   If such an ex-
traordinary omission had occurred, perhaps it would have been
the duty of the courts, at all events they would have found it ne-
cessary, to fix the date which the law had failed to prescribe.
Other systems would then be referred to, their provisions would
be compared, and the will of the legislature would be supposed
to approve the period adopted by that system offering the most
numerous points of coincidence with our own.   But no such

omission can be imputed to Congress. The bankrupt law has fixed the date of its own operation. That it differs from the date prescribed by other laws, only shows more clearly the intention to adopt a different rule. The will of our legislature is placed in more prominent contrast with the will of other legislatures, and other systems must be cited to show, not what has been adopted, but what was rejected.

We find, accordingly, that the English law expressly refers the operation of the bankruptcy, and the powers of the assignee, to the commission of an act of bankruptcy. That the law of France divests the debtor, from the day of the failure. That the bankrupt act of the United States, passed in 1800, re-enacted in terms the provision of the English law; that the law of Louisiana vests the property in the creditors, from the moment of filing the petition; and that the law of Congress, in terms equally explicit, vests the property in the assignee, from the date of the decree.

Each system has its rule. Which is the most conducive to the public welfare—which is best adapted to ensure a just and equal distribution of the property, are questions of legislative and political economy, which it would be worse than idle to discuss in a judicial proceeding before this court. The law having prescribed a rule, that rule must be obeyed, although the court should be of opinion that a better one might have been adopted.

The argument of the opposite counsel begins with the assumption, "that when the bankrupt files his petition and schedule, he surrenders his property to the court, which *by law* is made the administrator of the debtor's effects, for the benefit of all his creditors; and that the property and rights of property surrendered, become by operation of law divested out of the bankrupt, and pass from the hands of the court into those of the assignee." In the consideration of questions arising under the late bankrupt act, we should be careful not to suffer our familiarity with other systems to mislead us, or to withdraw our attention from the actual provisions of the law itself. It is difficult to divert the mind from its accustomed bias, and to conduct its impressions into a new channel. The theory of the bankrupt laws of England and of Louisiana, have been so deeply impressed upon our minds, that we are led almost unconsciously to consider the doctrine of rela-

tion, borrowed from the one system, and the stay of proceedings and the *concurso* of *all* the creditors, peculiar to the other, as forming a necessary and indispensable part of every system of bankruptcy. This caution is of the greatest importance. No stronger illustration of its necessity could be given, than the quotation of the paragraph from the argument on the other side.

In reading it, one would necessarily suppose that the counsel was stating the law of Louisiana, and not the law of the United States. Applied to the latter, it begs the question. It begins where the argument should have ended; and every proposition in the quotation is unfounded and erroneous. The filing of a petition in bankruptcy is not a surrender of property. The court is not by law the administrator of the debtor's estate; nor does the estate pass from the hands of the court, to those of the assignee.

The filing of the petition is not a surrender of property. The most attentive examination of the first section of the act, and of the form of the petition, prescribed by the Supreme Court of the United States, will furnish no ground for such an idea. ' The petition does not purport to be a surrender. It is not treated as such by the law, or by the court. It is simply a confession of insolvency, and a prayer for a decree and discharge. It implies an *offer* to surrender the property; for the divesting of the property of the petitioner, is the consequence of the decree which he solicits. The most ingenious construction can make it no more. But the difference between an offer to surrender, and an actual surrender, is sufficiently obvious. It may well be questioned whether this offer be irrevocable. There is nothing in the law which forbids the petitioner from retracting it. Before the decree, his circumstances may change, or he may conclude that they do not require the interposition of the law, and discontinue his prayer for the relief he no longer desires. His debts may be of such a character as to exclude him from the benefit of the law; and his creditors, cited for that end, may appear and show cause why the decree should not be granted. So far then from being a final and irrevocable surrender, the petition is but an offer to surrender, which may be withdrawn by the petitioner, resisted by the creditors, or refused by the court.

The court is not by law the administrator of the bankrupt's

effects. We have seen the fallacy of supposing that the property is vested in the court, either in form or substance, by filing the petition; and the court cannot administer that of which it has not possession or control. Nor does the law provide any mode of temporary administration.

The commissioners under the English law and under the bankrupt act of 1800, took immediate possession of the bankrupt's estate, and held it until the appointment of assignees. In Louisiana the judge accepted the cession, and appointed, if necessary, provisional syndics. In France the seals are affixed to the debtor's effects, and commissioners and agents are named by the decree opening the failure. Code de Commerce, arts. 449, 454. No corresponding provisions are found in the act of Congress. If it was intended that the property should be divested from the filing of the petition, the omission to provide some guardian for the estate, until the appointment of an assignee, would have been most remarkable. The absence of any such provision, corroborates the opinion that the property remains in the debtor until the decree.

If, then, the property never vests in the court, we may safely conclude, that it does not pass from the hands of the court into those of the assignee. It passes at once from the debtor to the assignee. The decree, which divests the one of his estate, invests the other, and makes the assignee, like the heir of the ancestor, the legal representative of the bankrupt.

The position assumed by the counsel leads to another anomaly. The court is not empowered itself to administer the property and protect the rights, either of creditors or of the debtor, during the interval between the petition and the decree, or to appoint an agent for that purpose. But, says the counsel, the bankrupt is divested by filing his petition. It follows, then, that there is an interval, during which the property has no owner and no administrator, and suits can neither be prosecuted nor defended. Such a result is contrary to the whole policy of our laws. Accident sometimes leads to delay in the qualification of an administrator, or the appearance of a new party to a suit; but no legislature ever enacted, that there should be, in the ownership of estates, or in the progress of judicial proceedings, a necessary and unavoidable *hiatus*.

But the argument which seems to have had the greatest weight

with the court, is drawn from the supposed policy of the bankrupt law. It is said that the great object of the law is to secure a *pro rata* distribution of the property of the debtor among his creditors; and that this object may be defeated by leaving the debtor in full control, and permitting the prosecution of suits, after filing of the petition. It is feared that creditors might suffer by the frauds of the debtor, and that suits, by collusion, or in the usual scramble for preferences, being prosecuted to execution, the property, the pledge of all the creditors, might be engrossed by a few. It is even suggested, that the description of property in the schedule would point it out for seizure, and assist in defeating that equitable distribution which the law intended to secure.

These objections appear very formidable, but we think a little reflection will diminish their importance. The first step in the proceeding, is the presentment, under oath, of a statement of the property and debts of the bankrupt. The creditors are cited to a public investigation of his affairs. The least violation of the law deprives him of the relief which he asks from the court; and his conviction of falsehood consigns him to a prison and to disgrace. Fraud, at such a time, need not be apprehended. The dishonest debtor, seeking to defraud his creditors, would scarcely await the filing of his petition, to accomplish his purpose. He would be more inclined to execute his fraud, and to allow such time to elapse as would cover it with the mantle of oblivion, before making his application, than to select for its perpetration, that period, of all others, the most unpropitious of success and impunity. Nor can it fail to strike the court, that the stay of proceedings itself would be a cover for fraud, and afford the greatest facility for its perpetration. The legislature of Louisiana, impressed with this fact, provided various modes of protecting the interests of creditors, by the appointment of provisional syndics in some cases, and the imprisonment of the debtor, or the sequestration of his estate, in others. But in the act of Congress we find no such precautions against the frauds, to which a stay of proceedings would tempt the dishonest.

It is true that, in the interval between the petition and the decree, some of the creditors may press their suits to execution, and obtain a preference over the rest. If this preference be acquired

by fraud or collusion, the law condemns it, and the assignee is authorized to have it set aside. If, on the other hand, it results from the regular course of judicial proceedings, we cannot perceive any reason why the creditor should be deprived of the reward of his vigilance. A levy, on the day before the filing of the petition, would certainly secure a lien. Would it be any more unjust or unreasonable, to grant the same lien to a levy made on the day after the filing of the petition? In both cases the gain of the seizing creditor is the loss of others; he is paid at the expense of the mass. In every case of *insolvency*, the creditor who forces payment by execution, is paid at the expense of other creditors— he diminishes the fund, from which they are to expect payment. As a matter of abstract justice and equality, the period of insolvency would then seem to be the point, at which preferences should cease to be acquired by legal pursuit; but that period is too vague and indefinite—too difficult of proof, and too fluctuating, to furnish a safe or salutary rule. Such a principle would throw open the doors of litigation and doubt so wide, that no man could rest secure upon his judicial rights. No system, with which we are acquainted, has attempted to adopt it.

The general policy of the law, is to encourage the competition of creditors; the most vigilant obtain the highest favor. But bankrupt laws are an exception to the principle. They prescribe a period when the race of vigilance shall cease. To say that this period should be fixed by the courts, upon considerations of equality and justice, would only be to leave it uncertain. To be definite, it must be fixed by arbitrary power. The legislature, in the exercise of its peculiar duties, having weighed all the considerations of policy applicable to the subject, must prescribe a rule. When prescribed, it governs the courts, like any other arbitrary act of the superior power.

This evil of occasional preferences, acquired by vigilance, is, however, more imposing in theory than in practice. It is only in a few large cities, that legal process is so summary, as to afford facilities for its occurrence. Throughout the country generally, the process is too slow; the delay between citation and trial—between judgment and execution, is too great, to give room for many, or important changes, in the rights of creditors, in the short

interval between the petition and the decree. Congress may well have regarded such occasional preferences, as a less evil, than the increase and complication of the machinery of the court, necessary to prevent it. In the attempt to establish a system both cheap and simple, some minor considerations would necessarily be sacrificed.

In England, bankruptcy was regarded as a crime. The forfeiture of the property was a punishment of the offence. As treason operated a forfeiture to the king, from the moment of its perpetration, so the estate of the bankrupt was forfeited to his creditors, from the commission of an act of bankruptcy. The suing out of a commission, was likened to the interdiction of a prodigal or a madman. It was the action and execution at once. (Bacon's Abridgment, *verbo* Bankrupt)—the *execution paré* of the common law. But this system has been greatly modified. A bankrupt is no longer treated as a malefactor. A debtor, desirous of surrendering his property, is no longer compelled, though innocent, to assume the demeanor of the criminal—to keep his house—to depart the realm—to lie in prison—in order that the most friendly of his creditors, may sue out his commission. By the act of 6 Geo. 4, sec. 6, he is permitted to make his declaration of insolvency, before the chancellor's secretary in bankruptcy, and thus openly solicit the interposition of the law.

So the doctrine of relation, originally a stern and unbending rule, annulling all transactions after the commission of the act, was from time to time relaxed. The extreme hardship and injustice sometimes resulting from its enforcement, led to the enactment of many and important exceptions, (Eden, 259,) until at last, by the statute 2 and 3 Vict., all transactions, payments, and seizures under execution, are protected, unless the party benefited thereby had actual notice of an act of bankruptcy.

The government of the United States once adopted the original system of Great Britain, but abandoned it, after a short trial. In resuming the consideration of the subject, forty years afterwards, it would have been indeed unwise in our legislators, to have rejected the improvements which had intervened in the system, and to have re-enacted it, with all its obsolete and discarded errors. Congress did not fall into so lamentable a mistake. They endeavored

to improve upon the system *now in force* in England, and to adopt one more simple, more expeditious, and more liberal. The law which resulted from their deliberations, is in many respects imperfect. It could not have been otherwise. A system of such great importance, could not, by a single effort, be brought to perfection; but the desire to abandon the errors of other systems, while their best features were preserved, was, no doubt, the prevailing spirit in the formation of the law.

The declaration of insolvency, is still the only step which the debtor can take, under the English law. The creditors alone can prosecute the fiat or commission. Congress went still farther. It authorized the debtor, not only to initiate the proceedings, but to prosecute them to the surrender of his property, and to his own discharge. So, instead of reviving the doctrine of relation, almost abandoned where it originated, Congress discarded it altogether, and fixed upon the date of the decree as a more definite and notorious point, from which the powers of the assignee over the estate of the bankrupt should commence. At the same time, the rights of creditors were protected, by stamping with nullity every act in contravention of the law, and by giving to the assignee full power to recover any advantage, *illegally* obtained.

We infer then, from what is enacted by the law, and from all that it has failed to enact, that until the decree, there is no change in the title to the bankrupt's estate, or in his right to administer and protect it; and, consequently, that the filing of the petition is not a reason for a stay of judicial proceedings.

The stay of proceedings under the law of Louisiana, was a consequence of the *concurso of all the creditors*, an institution, with its name, derived from the Spanish jurisprudence. As all creditors, without exception, were brought into the bankruptcy, there was *no occasion for separate proceedings*. For the same reason, it was a part of the theory of the law that the bankrupt, from the moment of his cession, was *civiliter mortuus*. *Elmes* v. *Estevan,* 1 Mart. 193. *David* v. *Hearn,* Ib. 207. The control of the syndic extended over all the property of the debtor, without regard to the liens, pledges, mortgages, or privileges affecting it. The law did not profess to annul these preferences, but it altered the remedy upon them. The execution of writs, issued even on final judg-

ment, was superseded. The syndic took from the hands of the sheriff, property seized under execution, and became himself the executive officer of the law in selling it. *Bermudez's Syndics* v. *Ibanez*, 3 Mart. 39. Civ. Code, art. 2180. Act of 1826. After the sale of the *entire* property, the proceeds were distributed to those having liens and privileges, in their respective ranks, and then to the ordinary creditors. The tableau of the syndic, therefore, embraced the whole range of liens, privileges and mortgages, conventional, tacit and legal, that abound in our laws.

But the whole of this system is unknown to the English law. Judicial process, there, is never interrupted.

" Although all acts in relation to his property, done by a bankrupt after an act of bankruptcy, *may be avoided* by the assignees, subject to certain exceptions by express statute, yet the bankrupt is still capable of maintaining actions, and no one can take advantage against him, by plea of his bankruptcy, before the commission and assignment under it ; the legal property remaining, till actual assignment, in the bankrupt himself. *Cullen*, 412.

Even after the issuing of the commission, although the property of the debtor is thereby withdrawn from new pursuit by legal process, the creditor is " still at liberty (until the discharge,) either to come in and take a proportionable benefit, under the commission, or to proceed against the person of the bankrupt, in the ordinary course of law." Cullen, 148.

The discharge itself does not operate as a stay. The mandate of the judge in the *cessio bonorum*, was binding upon the courts and creditors, without a plea—a judgment, rendered in violation of it, was a mere nullity ; while the discharge of the bankrupt, in England, can only avail him by *plea or motion*. Cullen, 399. Its operation is not to supersede legal process, but to confer on the bankrupt a new means of defence, which he can plead in bar, and which secures a judgment in his favor. If a creditor in England has a mortgage, a pledge, or a lien, or if he has made a seizure under execution, the bankrupt law does not interfere with his rights. It leaves him to his possession, or permits the sheriff to proceed with the sale, and to pay over the money *to the plaintiff*. The assignee has no power to disturb the possession, either of the creditor or of the officer. He is only authorized to *redeem* the pro-

Fisher and another v. Vose.

perty, by paying the amount of the lien, or by a performance of the condition, on which the right to the possession depends. Eden, 286, 290, 294. Cullen, 209. "He takes the property, in the same condition and subject to the same burthens, as the bankrupt himself had it." Cullen, 185. Hence the jurisdiction of the bankrupt courts is limited to the superintendence and control of *matters in bankruptcy*, and to controversies with, or between creditors, *who come into the bankruptcy*. 3 Chitty's Gen. Prac. 543.

Creditors having securities may keep out of the court. They have the choice of tribunals. They may proceed in the ordinary courts, or, if they ask the assistance of the bankrupt court, it will be given them. Eden, 451–2. 38 Eng. Com. Law Rep. 582. They discuss the property, affected by their peculiar claims, not in a *concurso*, but in their own suit. If it is more than sufficient to pay them, the assignee receives the excess ; if less than their claims, they then go into the bankruptcy as ordinary creditors, for their *pro rata* upon the balance. Proof in bankruptcy is a technical proceeding, involving a submission to the jurisdiction of the bankrupt court, a release of all right to preference, and a consent to a *pro rata* dividend. Cullen, 145. Hence the English assignee is the agent, and English bankruptcy is the *concurso*, not of *all* the creditors, but of the chirography creditors alone.

Now the two systems—that of Louisiana, and that of England, are not only unlike, but in these important particulars are diametrically opposed. Which of the two was adopted as the model of the bankrupt law of the United States ? A Congress, composed of the representatives of twenty-six states, all, save one, governed by the common law of England, and familiar only with the English jurisprudence, would naturally prefer the system with which it was best acquainted. The English system was, beyond all doubt, the model of our own. The act of Congress is but an abridgment of its provisions, with such changes and omissions, as were deemed necessary to accommodate it to the greater freedom and liberality of our institutions. An extension of the right of voluntary bankruptcy, a further restriction of the doctrine of relation, and a greater facility in obtaining a discharge, are the most prominent changes in the principles of the law. The court has observed, that the bankrupt law of the United States assimilates in a great degree, to

the law of Louisiana. In certain points, all bankrupt laws must necessarily bear a resemblance to each other. The appointment of an administrator of the property of the bankrupt, the distribution among the creditors, and the release of the debtor, either partial or entire, are of the essence of all bankrupt laws. But take out these points of resemblance, and look through the details of the respective laws—the powers of the assignee—the rights of particular creditors—the extent of bankruptcy jurisdiction, and the cumulation of suits, and we find, instead of resemblance, the most striking and pointed contrast. On the other hand, compare the law of Congress, in all these particulars, with the English law, and we observe a coincidence, as marked as the contrast exhibited by the first comparison.

There is certainly no provision in the act of Congress for a judicial mandate, staying proceedings either against the debtor or his property. How far the proceedings, from their character, operate as a supersedeas, will be seen by a short review of some portions of the law.

The *concurso* in bankruptcy, does not embrace *all* the creditors. The law distinctly recognizes two classes of creditors, viz : those who claim under the bankruptcy, and *those who do not claim under the bankruptcy.* Over the latter, the law assumes no control. If they are ordinary creditors, they lose their dividend, by neglecting to make their claims; if they have securities, they are left to the exercise of the legal rights resulting from such securities, without being forced to come into the bankruptcy.

Although the general provisions of the law could not fairly have been held to destroy any securities, lawfully acquired before the bankruptcy, the law, from abundant caution, has made express reservation of such rights. The description of the rights so protected, is given in the most comprehensive terms. " The lawful rights of married women or minors, or any liens, mortgages, or other securities on property, real or personal, which may be valid by the laws of the States respectively," (sec. 2,) fairly embrace every right to a preference, known even to the laws of Louisiana. There is a qualification that such rights must not be " inconsistent with the provisions of the second and fifth sections ;" and, it is sometimes contended, but without reason, that this reservation destroys

the proviso, to which it is appended. The only securities inconsistent with the provisions of the second section, are those given by the bankrupt, " in contemplation of bankruptcy," by way of preference to creditors, or fraudulently to persons other than " creditors and *bona fide* purchasers " without notice." All securities, so conferred, are declared to be a fraud upon the law and void ; the assignee is authorized to have them set aside ; and, of course, they do not come under the protection of the proviso. Let us now see what securities are inconsistent with the provisions of the fifth section.

That section declares, that " all creditors *coming in and proving their debts*, under the bankruptcy," shall share in the bankrupt's estate "*pro rata*, and without any priority or preference whatever," except only for debts due to the United States, to certain sureties, and to laborers. It further enacts, " that no creditor, *coming in and proving his debt*, shall be allowed to maintain any suit, at law or in equity, therefor, but shall be deemed thereby to have *waived* all right of action and suit *against such bankrupt ;* and all proceedings already commenced, and all unsatisfied judgments, already obtained thereon, shall be deemed to be *surrendered thereby*."

Thus it would seem, that by securities not inconsistent with the provisions of the fifth section, are meant *those which shall not have been proved in bankruptcy*. The proviso of the second section protects them, unless, being *waived* by proof, their further existence, *as preferences*, becomes inconsistent with the *prorata* distribution to all *who have proved their debts*.

If, then, a creditor, holding a security, values the protection offered to him by this proviso, he must keep out of the bankruptcy. If he " *comes in and proves his claim*," he does an act inconsistent with, and destructive of his right to a preference. The loss of the preference is, in that case, not the result of the law, but the voluntary act of the creditor, duly and fairly admonished by the law of the consequences of the act. If he prefers his dividend to his pledge, to his mortgage, or to his right of action, the law throws no impediment in the way of his free selection. " He can claim under the bankruptcy *or* against it, but he cannot do both, at the same time." Cranch, J. The law prescribes no

mode of proof, by creditors holding securities ; no form of reser-
vation, by which, when proving, they may secure their preference.
It contains no instructions for a classification of debts, giving to
one creditor the proceeds of this property—to another, the pro-
ceeds of other property—recognizing this creditor as entitled to
a general, and that to a special privilege. With the few exceptions
already named, all *who prove*, are paid *pro rata ;* and the very
form of division dwindles, from the complication and ceremony
of a tableau of distribution, to the simple declaration of a dividend.

The securities in question, though protected by the law, are
not available in the bankruptcy. By bringing them into the bank-
ruptcy, all right of action is *waived*, and all proceedings and un-
satisfied judgments *surrendered*. Does it not follow, that if a
creditor will not *waive* his right of action against the bankrupt,
the right still exists ? If it were destroyed by the mere filing of
the petition in bankruptcy, no right would rest in the creditor, to
be afterwards *waived* by him. Does it not follow, that the pro-
ceedings at law, by which alone mortgages, liens and privileges
can be enforced, remain within the reach of the creditor, unless
he consents to surrender them ? If these proceedings, the sole
remedies upon such securities, are destroyed by the transfer of
the bankrupt's rights to the assignee, what means the solemn farce
of enacting *how* the right to them, no longer in existence, may be
*surrendered ?*

If, then, the law intends that these rights shall not, by its pro-
visions, " be annulled, destroyed, or impaired," and, if they can-
not be enforced in bankruptcy, it follows, necessarily, that they
must be asserted in the ordinary tribunals. So far from impair-
ing them, the law does not interfere with them. The remedy
upon them remains the same ; the form of action is unaltered,
save that the claims asserted before the decree, against the bank-
rupt, must, after the decree, be ascertained and enforced, contra-
dictorily with the assignee. Hence the assignee is empowered to
sue and defend, like the bankrupt ; to succeed him in all suits,
pending at the date of the decree ; and to prosecute and defend,
in the same manner, as the bankrupt might have done before his
bankruptcy. He is not confined to the court of bankruptcy ; but
under these broad expressions, every court of ordinary jurisdic-

Fisher and another v. Vose.

tion is open to him, as plaintiff; and every such court, whose process can be served upon him, may exercise jurisdiction over him, as defendant, and bind him by its decrees. His position is more consistent than that of a syndic under the laws of this State, who is the representative and agent of conflicting interests and parties. Representing only the creditors who come into the bankruptcy, and specially charged with the protection of their rights, he contests, in all courts, the claims of creditors who do not come in, and who seek to diminish the assets of the bankruptcy.

The very organization of the bankrupt court, adds force to the position contended for. The sixth section, which confers the jurisdiction, limits it to "matters and proceedings in bankruptcy." In further defining this jurisdiction, it is said to extend to all "*controversies in bankruptcy*," between the bankrupt and creditors who shall *claim* any debt or demand, "*under the bankruptcy*," between "*such creditors*" and the assignee, and between the bankrupt and the assignee. The law gives no further jurisdiction, except that conferred by the eighth section concurrently on the District and Circuit Courts, over suits at law and in equity, between the assignee and "persons claiming an adverse interest, touching any property or rights of property, transferable to or vested in such assignee." With this exception, the jurisdiction is limited as strictly to bankrupt proceedings, as that of courts of probate to mortuary proceedings. But every suit against an executor is not a mortuary proceeding; nor is every suit against a bankrupt or an assignee, necessarily a proceeding in bankruptcy. The neglect, then, to provide for the transfer of all suits against the bankrupt to one tribunal, and for their cumulation in a single proceeding, was not the result of casual omission. Legislators, educated under a system of laws whose forms contain no analogous proceeding, would have listened with surprise to any proposal that such a cumulation should form a feature of the law.

It is sometimes said, that the bankrupt's property cannot be pursued elsewhere than in the bankrupt court, because all his property and rights of property are by law *vested* in the assignee. The estate vests in the assignee, as it vested in the bankrupt. He succeeds to the same rights, and enjoys by the same title; but he has no higher rights. If the property, before the bankruptcy,

was subject to liens or privileges, it was vested in the bankrupt subject to such liens and privileges, and it vests in the assignee under precisely the same burden. If, before obtaining possession, the bankrupt would have been obliged to redeem or discharge the pledge, so must the assignee, before he can acquire the possession; and the law provides for the contingency, by directing that the assignee may, under the revision of the court, redeem the property from such incumbrance. Sec. 11.

Considering then the language of the law, its apparent intent and policy, its analogies and contrasts with other systems, we are led to the conclusion, that Congress intended that there should be no stay of proceedings, no cumulation of suits, no *concurso* of all creditors, and no divesting of property (even by relation) before the time of the decree. The law makes no distinction, in these particulars, between voluntary and involuntary bankruptcy. In the latter class, the folly of suspending judicial process, would be flagrant. Such suspense would afford the debtor the best opportunity of withdrawing his person and property from the reach of the court.

With respect to the personal rights of the bankrupt, and his capacity to stand in judgment, we have already seen that the law does not interfere with them. Indeed, the argument of the counsel destroys his case. If the capacity of standing in judgment, was lost to the bankrupt by filing his petition, by what right is he prosecuting an appeal before this court? The court might well inquire of him, in the language of the judge of one of our lower courts, when a similar position was taken—If you cannot appear in court, what are you doing here? The counsel, probably perceiving that his position embarrassed his argument, obtained an order that the assignee should be made a party to the suit; but he has not been made a party, nor has he appeared. The counsel conducted his case in the same right after, as before this order. When the bankrupt shall have obtained his discharge, he may plead it in bar to the suit; but there is nothing in the law giving him the right to plead his *petition*, or even his *decree*, in bar or in abatement. So it has been decided by Judge Cranch, on the application of a bankrupt to be released from imprisonment for debt, after his decree, but before his discharge.

The plaintiff claims to have acquired a lien upon the credits attached in this case. It is not pretended that he has waived his lien, or surrendered his action, by going into the bankruptcy. The law does not require, nor even permit, the cumulation of his suit with the proceedings in bankruptcy; he then remains free to claim a judgment against the defendant until his discharge; and free to prosecute his suit against the property attached in the case, until the assignee shall appear and show, that the attachment was illegal or void. We do not pretend that the judgment in this case would be binding upon the assignee, if his appointment should have been made before the judgment; but it is not an unusual proceeding, for a plaintiff to prosecute his suit against one party in interest to final judgment, leaving other parties interested to protect their interests in some other form. Whatever lien was acquired by the levy—whether inchoate or complete—that lien still exists. The assignee succeeding to the rights of the bankrupt, and to his rights only, cannot claim the property, without relieving it from the lien. If he shall think proper to appear, and if he can satisfy the court that the lien was inchoate only, and that the bankruptcy of the defendant prevented its being perfected; or, if he can show that the levy was made by collusion with the defendant, and in fraud of the law, then the court will decree the property to him, instead of the plaintiff. But he is the only person who can present such issues for the determination of the court, and any decision upon them before they are properly presented, would be premature. It is sufficient for the plaintiff to maintain, that the judgment from which the defendant has appealed, is correct.

GARLAND, J. This case is before us, on an application for a re-hearing. We have carefully re-considered our judgment, and see no sufficient reasons to change it. The application for a re-hearing is, therefore, refused; but in coming to this conclusion, we do not intend to intimate any opinion, as to what may be the effect of the bankrupt law passed by Congress, upon the proceedings in the State courts, when a mortgage or lien is attempted to be enforced on property in the possession of the bankrupt, before or after the appointment of the assignee.